HONORABLE RICHARD A. JONES

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

GARY MANGUM, et al.,

10                    Plaintiffs,

CASE NO. C10-1607RAJ

11          v.

ORDER

12   RENTON SCHOOL DISTRICT,

13                    Defendant.

14
                          **I.  INTRODUCTION**

15

16          This matter comes before the court on Plaintiffs' motion to compel discovery

17   (Dkt. # 32), Defendant's motion for summary judgment (Dkt. # 35), and Plaintiffs' cross-

     motion for summary judgment (Dkt. # 41).  No one has requested oral argument, and the

18   court finds oral argument unnecessary.   For the reasons stated herein, the court GRANTS

19   Defendant's motion for summary judgment in large part and DENIES both of Plaintiffs'

20   motions.  Plaintiffs must submit an amended complaint in accordance with this order no

21   later than December 2, 2011.  The court VACATES the trial date and all pretrial

22   deadlines in this matter.

23                          **II.  BACKGROUND**

24          Plaintiffs Gary and Elizabeth Mangum are the parents of I.M., a 16-year-old boy.

25   With the exception of a brief period in his early elementary education, I.M. has been a

26   student in the Renton School District (the "District").  He currently is a student in the

27   ORDER – 1

28

District's H.O.M.E. program, a program that provides in-school instruction to supplement parents' homeschooling efforts.

The Mangums claim that I.M. is entitled to "special education" within the meaning of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1482. 20 U.S.C. § 1401(25) (defining "special education"). The IDEA requires states receiving federal education funding to "provide a basic floor of opportunity through a program individually designed to provide educational benefit to the handicapped child." *Board of Educ. v. Rowley ex rel. Rowley*, 458 U.S. 176, 179 (1982). The "floor of opportunity" is described in the statute as a "free appropriate public education." 20 U.S.C. §§ 1401(8), 1412(a)(1). The Mangums also attempt to state a claim under Section 504 of the Rehabilitation Act (29 U.S.C. § 794), which also provides assistance for students with disabilities.[1]

Although the Mangums point to events occurring as early as 2002, the court begins its review of the evidence in September 2007. It was then that the District received an evaluation of I.M. from Dr. Judith Cohen, a psychologist in private practice. Administrative Record ("AR") 121. The Mangums paid Dr. Cohen to conduct the evaluation in April 2006. In the two-page report, Dr. Cohen diagnosed I.M. with "visual-motor and small motor disabilities" for which she recommended a variety of accommodations, including note-taking software, instructional outlines, additional time to complete assignments, and an occupational therapy evaluation. AR 111. Dr. Cohen found that I.M. needed "academic remediation in the areas of math and written language," but that he did "not have a specific learning disability in these areas." AR 112.

---

[1] The Mangums frequently refer to their claim under Section 504 of the Americans with Disabilities Act ("ADA"). The court assumes that they mean to refer to the Rehabilitation Act. The ADA contains no Section 504.

ORDER – 2

The District treated Dr. Cohen's report as a "formal referral for special education." AR 121.  It assembled a team to evaluate I.M. to determine if he was eligible for special education services.  In a December 2007 written report summarizing the results of the evaluation, the District concluded that I.M. was not disabled within the meaning of the IDEA.  AR 147-56.  That report focused on I.M.'s difficulties with fine motor control, particularly in writing.  The report recommended that he receive certain accommodations, including the use of special grips for pens and pencils, and "Co:Writer" software to assist him with writing.  AR 151, 153.  The report referred I.M. "to the 504 team to address recommendations from the evaluation team."  AR 154.

The same month, the Mangums requested an independent educational evaluation ("IEE") for I.M. at the District's expense.  AR 157.  The District, through its Director of Special Education Services, Rebecca Lockhart, promptly granted the request.  AR 158.  Her letter granting the request included various resources to assist the Mangums in completing the IEE.  *Id.*  Mr. Mangum wrote Ms. Lockhart on January 23, 2008, inquiring about how to arrange for the IEE.  AR 159-60.  Ms. Lockhart responded the same day, explaining that the Mangums needed to select an evaluator who met certain criteria, at which time the District would arrange to pay the evaluator.  AR 159.  Mr. Mangum testified that he knew even in January 2008 that he wanted Dr. Ann Uherek, a clinical psychologist, to conduct the IEE.  AR 465-66, 72.  Dr. Uherek had previously evaluated his older son, and he had been pleased with her services.  AR 465-66.

The IEE did not occur until much later.  Dr. Uherek evaluated I.M. from late September 2009 until the middle of November 2009.  AR 217.  The District did not receive Dr. Uherek's evaluation report until January 2010.

There is no evidence that the District bears any responsibility for the long delay in conducting the IEE.  Mr. Mangum could have informed Ms. Lockhart as early as January 2008 that he wished to use Dr. Uherek.  There is no evidence that he did.  Indeed, there is

ORDER – 3

no evidence that the Mangums provided anything to the District in response to Ms. Lockhart's January 2008 instructions for selecting an evaluator until September 2008. AR 187 (Sept. 2, 2008 email from Mr. Mangum to Ms. Lockhart informing her that he had selected an unnamed neuropsychologist). Mr. Mangum testified that he had no evidence that he had given the District Dr. Uherek's name prior to September 2008. AR 491. When the District received Mr. Mangum's September 2008 email, Ms. Lockhart responded the next day asking for the name of the evaluator he had selected. AR 187. When she received no response, she sent another email on September 9, 2008 to make sure that Mr. Mangum had received the first email. AR 190. There is no evidence that she received a response. There is no evidence of further communication between the Mangums and the District regarding the IEE until March 3, 2009, when Mr. Mangum wrote an email claiming that he had selected a psychologist and scheduled a tentative appointment, but that the psychologist had not received required information from the district. AR 193. The email did not use Dr. Uherek's name. Mr. Mangum testified that he had no evidence that he had provided the District with Dr. Uherek's name prior to his March 3, 2009 email. AR 495-96.

The District and the Mangums met on March 12, 2009 to discuss a Section 504 plan for I.M. The Section 504 plan that the parties signed at the meeting noted that Dr. Uherek would evaluate I.M. for "dysgraphia." AR 350. This is the first evidence that the District knew that the Mangums had chosen Dr. Uherek.[2] The record reflects that District personnel traded telephone calls with Dr. Uherek thereafter, but had still been unable to coordinate the evaluation in August 2009. AR 198. The Mangums did not schedule a meeting with Dr. Uherek until September 27, 2009. AR 206. As noted, her evaluation took place over several dates from September 2009 through November 2009.

---

[2] Mr. Mangum admitted that he had no recollection of ever verbally informing the District of his choice of Dr. Uherek prior to March 3, 2009. AR 539-40. He believed that Mrs. Mangum had done so. AR 539. Mrs. Mangum, for her part, could not provide any specific testimony about when she or her husband told District personnel that they had chosen Dr. Uherek. AR 733-36.

ORDER – 4

In a detailed written report, Dr. Uherek concluded that I.M. had "inherently average to above average intelligence," AR 223, but a "specific learning disability in mathematics" that she called "developmental dyscalculia." AR 224. She noted various other learning difficulties, including difficulties with writing, difficulties with specific types of memory, and attention deficits. AR 223-25. She made several specific recommendations for accommodations, including special education services in mathematics. AR 225-26. It is not clear when Dr. Uherek issued her report, but it is clear that the District did not receive it until January 9, 2010. AR 232. Again, there is no evidence that the District bears any responsibility for the delay. AR 215-16 (Jan. 5, 2010 requests for copy of Dr. Uherek's report).

District personnel met with the Mangums on February 4, 2010. Five days later, the District's Secondary Special Education Director, Rebecca Donnelly, sent the Mangums a letter informing them that a District "Evaluation Team" would "review and consider the evaluation completed by Dr. Uherek." AR 239.

By April 2010, the evaluation team had yet to convene. Mr. Mangum sent District officials an email on April 12 detailing his concerns about the District's conduct since receiving Dr. Uherek's report and expressing his frustration that the District was essentially starting the evaluation process anew. AR 255-56.

On April 19, 2010, the Mangums filed a request for a due process hearing with Washington's Office of the Superintendent of Public Instruction. AR 259-63. They demanded placement at a private school, including accommodations consistent with those Dr. Uherek had recommended. AR 263.

The due process hearing occurred in June 2010 before an administrative law judge ("ALJ"). The ALJ issued a written decision denying all relief to the Mangums. AR 39-49. The ALJ reached three principal conclusions. She found that to the extent the Mangums were challenging the District's December 2007 finding that I.M. was not

ORDER – 5

disabled, their due process request was untimely, because the law requires such requests within two years of the challenged action.  AR 46 (citing WAC § 392-172A-05080 and 34 C.F.R. § 300.508).  She found that to the extent the Mangums contended that the District did not fulfill its responsibilities in conducting the IEE, those claims were also untimely.  AR 46-47.  Finally, she rejected the contention that the District had not complied with the law after receiving Dr. Uherek's report.  She found instead that the District had complied with all applicable regulations.  AR 48-49.

The Mangums, proceeding without an attorney as they had before the ALJ, sued in this court in October 2010.  In their operative complaint, they request that the court order the District to pay for I.M.'s education at Dartmoor Academy, a private institution.  Amend. Compl. (Dkt. # 31) ¶¶ 55-57 (requesting expenses for tuition, books, transportation, and accommodations Dr. Uherek recommended).  They also make a request for "such other damages under Section 504 of the Americans with Disabilities Act as [the court] sees fit to make the Student whole, given that what the Student has lost cannot be made whole by any amount of compensatory education."  *Id.* ¶ 58.

The court now considers the parties' summary judgment motions to determine if either party has shown that the Mangums are (or are not) entitled to the relief they request as a matter of law.  After resolving the summary judgment motions, the court will consider the Mangums' motion to compel discovery.

### III.   ANALYSIS OF CROSS-MOTIONS FOR SUMMARY JUDGMENT

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party.  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party must initially show the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

ORDER – 6

323 (1986). The opposing party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). The court defers to neither party in resolving purely legal questions. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

Because these summary judgment motions require the court to review the ALJ's decision, the court is mindful of the IDEA's unusual standard of review. The court neither reviews the ALJ's decision de novo nor gives the decision the deference courts customarily give to agency decisions. *J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438 (9th Cir. 2010). A party challenging the ALJ's factual conclusions bears the burden of proof, by a preponderance of evidence. *Id.* The court must review the administrative record, but may also consider additional evidence. *Id.*; 20 U.S.C. § 1415(i)(2)(B)(ii). The court has discretion to give the ALJ's findings as much deference as is appropriate given the thoroughness and care apparent in the ALJ's written decision. *Id.* (describing "due weight" standard of review); *see also Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993) (describing "unusual mixture of discretion and deference").

In their summary judgment motions, the parties make no mention of the IDEA's standard of review for the decisions of an ALJ. Although parties are free to permit the court to apply that standard after reviewing their written materials, they have not done so here. *See Jackson*, 4 F.3d at 1472 (noting the district court's authority to "essentially [conduct] a bench trial based on a stipulated record."). Accordingly, the more exacting standards applicable to summary judgment motions constrain the court. Ultimately, this makes no difference. The court's conclusions today would be the same under any evidentiary standard.

ORDER – 7

1    The court's analysis begins at the Mangums' April 19, 2010 due process hearing

2  request.  That request is critical for two reasons.  First, the IDEA's statute of limitations,

3  mandates that the Mangums cannot challenge conduct occurring more than two years

4  before this request.  Second, the IDEA's exhaustion requirement mandates that before

5  coming to this court, the Mangums must not only raise their IDEA claims in a due

6  process hearing, but also any claim for which they seek relief that the IDEA could

7  provide.  As the court will now discuss, these two requirements are fatal to most of the

8  Mangums' claims.

9  **A.      The Mangums' IDEA Claims Based on Conduct Prior to April 2008 Are**
   **Untimely.**

10        The IDEA requires parties seeking relief to file a request for a due process hearing

11  within two years of the action they are challenging:

12        A parent or agency shall request an impartial due process hearing within 2
          years of the date the parent or agency knew or should have known about the
13        alleged action that forms the basis of the complaint, or, if the State has an
          explicit time limitation for requesting such a hearing under this subchapter,
14        in such time as the State law allows.

15  20 U.S.C. § 1415(f)(3)(C); *see also* WAC § 392-172A-05080(2) ("hearing request must

16  be made within two years of, and allege a violation that occurred not more than two years

17  before, the date the parent or school district knew or should have known about the alleged

18  action that forms the basis of the due process complaint"); *see also* 30 C.F.R.

19  § 300.507(a)(2) (materially identical federal regulation).  There are exceptions to the two-

20  year requirement, which the court will address at the conclusion of this section.

21        The court agrees with the ALJ's ruling that the Mangums did not timely challenge

22  the District's December 2007 conclusion that I.M. did not have a disability that entitled

23  him to special education.  To challenge that decision, the Mangums needed to file a due

24  process hearing request no later than December 2009.  *See J.W.*, 626 F.3d at 444-45

25  (applying older IDEA statute of limitations to bar Plaintiffs from challenging any conduct

26  occurring three years before they filed a hearing request).  They did not.  The ALJ thus

27

28  ORDER – 8

1    ruled that any challenge to that decision was untimely.  The court finds no evidence,

2    much less a preponderance of evidence, that supports the Mangums' argument that this

3    ruling was in error.

4           Moreover, while the ALJ's ruling mentions only a few specific examples of

5    conduct that the Mangums had failed to timely challenge, the ruling applies equally to all

6    conduct that occurred prior to September 2007.  The ALJ focused on the December 2007

7    evaluation and Dr. Cohen's August 2007 report.  In their recent court filings, including

8    those supporting their summary judgment motion, the Mangums point to the District's

9    failure to consider I.M.'s asthma in their 2007 evaluation or sooner, the District's failure

10   to consider I.M's March 2004 mathematics scores on a standardized national test, and the

11   District's failure to consider a 2002 report from Dr. Cohen allegedly diagnosing I.M. with

12   attention deficit disorder ("ADD").[3]  If the Mangums wished to challenge these alleged

13   _____

     [3] Although the court ultimately does not need to address the merits of the Mangums' contentions

14   about I.M's asthma, his 2004 test scores, and Dr. Cohen's alleged 2002 ADD diagnosis, the court
     discusses them here nonetheless.  The discussion shows not only that the problems with the

15   Mangums' claims go beyond their untimeliness, but that the Mangums have strained their
     credibility in their efforts to cast the District's conduct in a negative light.  I.M. has asthma;

16   Plaintiffs contend that it has caused him to miss many days of school over his educational career.
     In 2004, as a third-grader, he took the Iowa Test of Basic Skills, a standardized national test.  His

17   mathematics computation scores placed him in the 21st percentile, whereas his mathematics
     conceptual scores placed him in the 71st percentile.  According to the Mangums, Dr. Cohen

18   diagnosed I.M. with ADD in 2002 and informed the District.  These assertions are important, in
     the Mangums' view, because each supports the notion that the District should have recognized

19   their son's potential disabilities much sooner, and should also have evaluated him for a broader
     range of disabilities in 2007.

20
            These allegations trouble the court.  Not only do the Mangums have little evidence to

21   support them, they are in some ways so implausible that they call the Mangums' good faith into
     question.  Perhaps most importantly, there is no evidence that the Mangums made any of these

22   allegations to either the District or the ALJ at any time prior to their May 2011 amendments to
     their complaint in this lawsuit.  While it is at least possible that the Mangums were unaware of

23   I.M.'s third-grade test scores before then (although there is no evidence proving as much), there
     is no possibility that they were unaware of their son's asthma or unaware of Dr. Cohen's

24   supposed ADD diagnosis.  If these assertions were compelling evidence of a disability, why did
     the Mangums fail to raise them until 2011?

25
            The asthma allegations are particularly troubling.  The District's 2007 evaluation of I.M.

26   included an evaluation from a school nurse who noted "no serious injuries or illnesses in the last
     three years," "no daily or regular medications," and overall "good health."  AR 156.  If the nurse

27   had failed to observe asthma so serious as to render I.M. disabled, why did the Mangums fail to

28   ORDER – 9

misdeeds, they were obligated to file a due process hearing request much sooner than they did.

The Mangums cannot take refuge in any of the exceptions to the two-year limitations period for a due process hearing request. The two-year requirement does not apply in two circumstances:

> (i)    specific misrepresentations by the [school] that it had resolved the problem forming the basis of the complaint; or

> (ii)   the [school]'s withholding of information from the parent that was required under this subchapter to be provided to the parent.

20 U.S.C. § 1415(f)(3)(D); *see also* WAC § 392-172A-05080(2). The Mangums do not point to a single "specific misrepresentation" from the District, much less one that led them to believe that the District had "resolved the problem[s]" with respect to I.M.'s alleged disabilities. There also is no evidence that the District withheld any information from the Mangums. With one possible exception, all of the evidence that the Mangums point to as information the District should have acted on (including Dr. Cohen's 2002

---

mention this in their many emails challenging the evaluation, much less in the due process hearing? Dr. Uherek knew I.M. had asthma in 2009, but had no apparent concerns. AR 217 ("[I.M.] has seasonal allergies and asthma and is treated with Albuterol as needed. He was also reported to take small doses of prednisone to head off an asthma attack. . . . He is overall a well-child."). If Dr. Uherek, like the school nurse, had failed to note I.M.'s allegedly disabling asthma, why did the Mangums not mention it until 2011? The court notes, moreover, that the Mangums offer no evidence to support their claim that I.M. missed many days of school because of his asthma. *Cf.* AR 751 (Mrs. Mangum testifying that I.M. had "some absences this year because he had a really serious health issue come up[, a]nd we did not tell [District personnel] what that issue was because it's embarrassing to my son.").

The sole evidence of Dr. Cohen's alleged 2002 ADD diagnosis is a November 2008 note from a District employee who had reviewed I.M.'s records. Dkt. # 39-2. She simply stated that "[i]n 2002, [I.M.] was tested by Dr[.] Judith Cohen and diagnosed with ADD." *Id.* There is no other evidence on this issue. Despite its employee's email, the District has been unable to locate any record of the 2002 diagnosis. Dr. Cohen did not mention ADD or any 2002 evaluation in the report she gave to the District in 2007. There is no evidence that the Mangums have attempted to have Dr. Cohen (who they hired) search for any evidence of her 2002 diagnosis. This is perhaps unsurprising, because Mr. Mangum testified that I.M. never saw Dr. Cohen prior to 2006. AR 458. Thus, the Mangums have not proven by a preponderance of evidence that any 2002 ADD diagnosis occurred, much less that the District ignored it. More importantly, there is no evidence that anyone who has evaluated I.M. since 2002 (including the District's evaluators, Dr. Cohen, and Dr. Uherek) has so much as suggested that I.M. suffers from ADD.

ORDER – 10

ADD diagnosis and I.M.'s asthma) was evidence that the Mangums were aware of long before they filed a due process hearing request.  More importantly, there is no evidence that the District withheld any of this information from the Mangums.  The sole possible exception is I.M.'s third-grade mathematics test scores.  While it is at least possible that the Mangums were unaware of these scores, they provide no evidence to prove as much.  In light of the Mangums' failure to prove that they were unaware of any material information at any time prior to their due process request, the court need not reach reach the question of whether the law required the District to share any of this information with the Mangums.

**B.     The Mangums' Have No Valid Claims Based on Conduct Between April 2008 and the ALJ's June 2010 Ruling.**

The court now turns to conduct occurring after April 2008, as this conduct is at least within the two-year period preceding the Mangums' due process request.  The only "action" taken by the District for the first 20 months of this period was to wait for the Mangums to arrange an IEE for I.M.  As the court has noted, the District informed the Mangums that it would pay for an IEE, it merely required the Mangums to select an evaluator.  In other words, the District complied with the law.  Washington IDEA regulations require a district receiving a request for an IEE to either convene a hearing to challenge the need for an IEE, or to agree to provide one at public expense.  WAC § 392-172A-05005(2)(c).  The District chose the latter route, and provided the Mangums with information about how to obtain an IEE and the criteria applicable to evaluators, as the law requires.  WAC § 392-172A-05005(1)(b).  The law prohibited the District from requiring the Mangums to conduct an IEE promptly or interfering in their choice of an evaluator.  WAC § 392-172A-05005(7)(b) ("Except for the criteria [related to qualifications of an evaluator], a school district may not impose conditions or timelines related to obtaining an independent educational evaluation at public expense.").  From December 20, 2007 (when the District first informed the Mangums that it would pay for

ORDER – 11

an IEE and provided information on arranging it) to January 8, 2010 (when Dr. Uherek finally provided the District with her report), the District waited for the Mangums. The District followed the law in doing so.

After it received Dr. Uherek's report, the District again followed the law. The law requires only that the results of an IEE "[m]ust be considered by the school district, if it meets agency criteria, in any decision made with respect to the provision of FAPE to the student." WAC § 392-172A-05005(5)(a). Upon receipt of Dr. Uherek's report, the District arranged a February 4, 2010 meeting to discuss it with the Mangums.[4] Five days later, the District informed the Mangums that it had appointed a leader for a new evaluation team to determine if I.M. qualified for special education. In other words, the District treated Dr. Uherek's report, which it received more than two years after the District had last determined I.M. to be not disabled, as a new referral for special education. Nothing in the law prohibited the District from doing so. The ALJ's decision explains how the District's actions after receiving Dr. Uherek's report followed the regulatory timeline for responding to special education referrals. AR 47-49. The court need not repeat the ALJ's explanation, which correctly concluded that the District followed the law. At the time the ALJ issued her decision, the Mangums were refusing to consent to permit the District's team to evaluate I.M. AR 302 (May 11, 2010 letter: "we have determined to withhold our consent for evaluation at this time for the reasons outlined below"); AR 307 (May 13, 2010 email: "I'm sorry, I thought 'withhold our consent at this time' was sufficiently clear and to the point . . . ."). The law does not permit, much less require, the District to evaluate I.M. despite his parents' refusal to consent to the evaluation. WAC § 392-172A-03000(1)(a).

---

[4] The District originally scheduled the meeting for January 28, 2010, but postponed it at the Mangums' request. AR 253.

ORDER – 12

**C.     The Mangums Have Not Exhausted Any IDEA-based Claims Arising After the ALJ's Decision.**

The court now considers the District's actions after the ALJ's decision. Obviously, the ALJ rendered no opinion on these actions. The record reveals that the Mangums eventually permitted the District's team to evaluate I.M. In December 2010, the District issued a report again concluding that I.M. was not disabled within the meaning of the IDEA. The Mangums disagree with this evaluation as well, and they discuss its alleged shortcomings in their summary judgment motion.

The Mangums have not exhausted any IDEA claims based on the District's conduct after the ALJ's decision, and the court cannot consider them. The IDEA requires a party seeking relief in court to first raise those claims in a due process hearing. 20 U.S.C. § 1415(i)(2)(A) (granting right to bring civil action solely to party "aggrieved by the findings and decision made under" IDEA subsections addressing due process hearing and disciplinary placements in alternative educational setting). An IDEA defendant can point to a plaintiff's failure to exhaust claims in a due process hearing as an affirmative defense. *Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 867 (9th Cir. 2011). Here, there is no dispute that the Mangums have not requested a due process hearing as to any IDEA claims based on the District's conduct after the ALJ's decision. The court will not consider those claims.

The IDEA's exhaustion defense extends not only to IDEA claims, but to any claim for which the "relief sought by a plaintiff in the pleadings is available under the IDEA." *Id.* at 871. This broader exhaustion defense arises from the IDEA itself.

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) [relating to due process hearings] shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

ORDER – 13

20 U.S.C. § 1415(l).  A court considering an exhaustion defense must "start by looking at a complaint's prayer for relief and determin[ing] whether the relief sought is also available under the IDEA."  *Payne*, 653 F.3d at 875.

The only relief that the Mangums identify with specificity in their prayer for relief is a set of remedies that the IDEA provides.  They request all-expenses-paid placement for I.M. at a private school.  Amend. Compl. (Dkt. # 31) ¶¶ 55-57.  The IDEA provides "publicly funded private-school placements when necessary."  *Forest Grove Sch. Dist. v. T.A.*, 129 S. Ct. 2484, 2490-91 (2009); 20 U.S.C. § 1412(a)(10)(C)(ii) (permitting court or ALJ to order reimbursement of private school expenses).

The Mangums' prayer for relief also includes a request for "such other damages under Section 504 of the Americans with Disabilities Act [sic] as it sees fit to make the Student whole."  Amend. Compl. (Dkt. # 31) ¶ 58.  To the extent that the "other damages" arise from the District's failure to provide a free adequate public education, the Mangums must exhaust them in an IDEA due process hearing as well.  *Payne*, 653 F.3d at 875.  If the Mangums seek Section 504 damages that do not arise from the District's alleged denial of an adequate education for I.M., they have nowhere articulated what those damages are.  Indeed, as the court will discuss in the next section, the Mangums have done little to explain their Section 504 claims.

Before discussing Section 504, the court summarizes its disposition of the Mangums' IDEA claims and their Section 504 claims that seek relief available under the IDEA.  To the extent their IDEA claims arose before April 2008, they are untimely.  To the extent their IDEA claims arose between April 2008 and the ALJ's decision in June 2010, the District did not violate the IDEA as a matter of law.  To the extent their IDEA claims (or any Section 504 claims seeking relief available under the IDEA) arose after June 2010, the Mangums have failed to exhaust their claims.

ORDER – 14

**D.      The Mangums Have Not Articulated a Viable Section 504 Claim.**

Section 504 of the Rehabilitation Act and the IDEA are similar in many ways. Section 504 does not specifically target education, but rather broadly prohibits disability discrimination in any federally-funded program or activity.

> No otherwise qualified individual with a disability in the United States, as defined [elsewhere in the Act], shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance

29 U.S.C. § 794(a).  Section 504 uses the definition of "disability" from the ADA.  29 U.S.C. § 705(20)(B) (referring to 42 U.S.C. § 12102); 42 U.S.C. § 12102(1) (defining "disability").  Both Section 504 and the IDEA guarantee a free adequate public education, but Section 504's guarantee is somewhat broader.  Schools satisfy the IDEA's guarantee by creating an individual education plan, but no such plan is necessary to meet the Section 504 guarantee.  *Mark H. v. Lemahieu*, 513 F.3d 922, 933 (9th Cir. 2008). Section 504 instead requires schools to provide "aids and services" that are "designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons."  34 C.F.R. § 104.33.

The record is skimpy with respect to Section 504.  The District's December 2007 evaluation concluded with a referral of I.M. to its "504 team for consideration of development of a 504 plan."  AR 153.  It also appears, however, that the District and the Mangums agreed upon unspecified Section 504 accommodations at the December 2007 meeting preceding that evaluation.  AR 157 (email from Mr. Mangum stating "I appreciate the 504 accommodations discussed and agreed upon in the team meeting last week").  By the next month, it appears that the District and the Mangums were no longer in complete agreement regarding Section 504 accommodations.  AR 162.  The record is silent until March 2009, when the parties met to "discuss [I.M.]'s progress and the current status of the agreed-upon 504 accommodations."  AR 193.  At a March 12, 2009

ORDER – 15

meeting, the parties agreed to a 504 Plan with accommodations for I.M.'s "severe difficulty with handwriting." AR 348. What has happened thereafter with respect to Section 504 is not at all clear.

Mangums have not articulated a Section 504 claim in either their operative complaint or their submissions supporting these summary judgment motions. They mention Section 504, but never explain how it applies to I.M. or how it supports any particular form of relief.

To the extent that the Mangums invoke Section 504 to support their request for private educational placement and payment of related expenses, the court grants summary judgment against that claim. Even if Section 504 permitted the court to award such relief, the Mangums have offered neither evidence nor argument from which anyone could conclude that they are entitled to it.

To the extent the Mangums have a Section 504 claim for relief other than the one described in the previous paragraph, they have not articulated it either in their complaint or in their submissions to the court. On this record, however, it is possible that they exhausted a Section 504 claim via their due process hearing and that claim is ripe for this court to decide.[5] It is also possible that they have a Section 504 claim that is not subject to the IDEA's exhaustion requirement. Neither the Mangums' submissions to the court nor the District's minimal effort to address their Section 504 claim permit the court to assess those possibilities. The court will therefore permit the Mangums, if they wish, to amend their complaint to clarify their Section 504 claim.

The court emphasizes that it has already held that to the extent the Mangums' Section 504 claim seeks relief available under the IDEA, they are bound to the IDEA's

---

[5] One of the curious byproducts of the IDEA's expansive exhaustion requirement, as the *Payne* court articulated it, is that while a Plaintiff must exhaust certain Section 504 claims in a due process hearing, neither Section 504 nor regulations implementing it empower an ALJ (or other adjudicator) to resolve them. The ALJ in this case reminded the parties several times that she could not resolve Section 504 claims. *E.g.*, AR 682, 720

ORDER – 16

1  exhaustion requirement.  Section 504 contains no exhaustion requirement of its own, but

2  a plaintiff must exhaust any claims seeking relief available under the IDEA.  As to any

3  claim that they did not raise in the due process hearing, the Mangums must therefore

4  specifically identify relief available to them under Section 504 that is not available under

5  the IDEA.

6      Moreover, the Mangums shall be mindful that their Section 504 claims must be

7  timely.  Section 504 has no statute of limitations of its own, so courts borrow the most

8  closely analogous state statute of limitations.  *Alexopulos v. San Francisco Unified*

9  *School Dist.*, 817 F.2d 551 (9th Cir. 1987).  Washington's general statute of limitations

10  for personal injury claims is three years.  RCW § 4.16.080(2).  So far as the court is

11  aware, no court has decided whether this is the statute most analogous to Section 504

12  claims.  The court will not decide the issue at this stage.

13      The District correctly argues that the Mangums cannot prevail on a Section 504

14  claim *for damages* without proving that the District acted with at least deliberate

15  indifference.  *Mark H.*, 513 F.3d at 938 (explaining that deliberate indifference is action

16  or inaction despite knowledge of the substantial likelihood of resulting harm to a federal

17  right).  The District makes no argument about the standard applicable to Section 504

18  claims for equitable relief.  *See Bonner v. Lewis*, 857 F.2d 559, 566 (9th Cir. 1988)

19  (noting availability of injunctive relief for Section 504 claims).  Although the court sees

20  no evidence of deliberate indifference on the record before it, it declines to decide the

21  issue until the Mangums have amended their complaint.

22      The court in no way suggests that the Mangums have a viable Section 504 claim,

23  nor encourages them to continue to pursue one.  The interplay between Section 504 and

24  the IDEA is complex, to say nothing of the complexity of Section 504's implied private

25  right of action.  The Mangums may wish to consider whether pursuing such a claim pro

26  se is in their best interests, particularly where it may divert their efforts from attending

27

28  ORDER – 17

more directly to their son's educational needs.  The court merely decides today that it will not foreclose the Mangums' efforts to obtain relief under Section 504 without giving them a final opportunity to clarify their Section 504 claims.  *See*, *e.g.*, *Mark H.*, 513 F.3d at 925 ("Without some clarity about precisely which § 504 regulations are at stake and why, we cannot determine whether the [plaintiff] has sufficiently alleged a privately enforceable cause of action for damages.").

## IV.  THE MANGUMS' MOTION TO COMPEL

The court declines to grant any relief to the Mangums on their motion to compel discovery.  The court finds that none of the discovery they request in that motion would have been of assistance to them in the summary judgment motions.  The court makes the following specific rulings:

1) The District has made a sufficient search for any recordings of the February 2010 and May 2010 meetings between the District and Plaintiffs.  The court is satisfied that the District either never made such recordings or misplaced them inadvertently.

2) If Plaintiffs seek raw testing data from Dr. Uherek and Dr. Cohen, they shall obtain that information directly from them.  There is no need to burden the District with finding information that the Plaintiffs can obtain from other sources.  The court notes that the ALJ already required the Plaintiffs to produce this data once.  AR 55.

3) The District has no further obligation to search for records of Dr. Cohen's alleged evaluation of I.M. in 2002.

4) The District need not produce further evidence regarding I.M.'s participation in the District's Title I programs prior to 2005.

5) The District need not produce records in electronic format (along with metadata).  The court is satisfied with the adequacy of the District's efforts to

ORDER – 18

find and produce email and other records relevant to this dispute.  The court finds no reason to require the District to incur the additional burden of producing data in electronic format.

## V.  CONCLUSION

For the reasons stated above, the court GRANTS the District's motion for summary judgment (Dkt. # 35), but does so without prejudice to the Mangums' opportunity to articulate a Section 504 claim.  The Court DENIES the Mangums' motion for summary judgment and their motion to compel.  Dkt. ## 32, 41.

This order dismisses the Mangums' IDEA claims in their entirety, although it does so without prejudice to any timely but not-yet-exhausted IDEA claim.  The Mangums may file an amended complaint for the sole purpose of articulating one or more viable Section 504 claims in accordance with this order.  They shall file the amended complaint no later than December 2, 2011.  If they do not, the court will dismiss this action for failure to prosecute.

The court VACATES the trial date and all other pending deadlines in this case.  If the Mangums elect to file an amended complaint, the court will issue an order scheduling proceedings for resolving any Section 504 claim they raise.

DATED this 31st day of October, 2011.


_Richard A Jones_
_____

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 19